Filed 11/4/13  In re D.F. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re D.F., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>            v.<br><br>R.F., et al.<br><br>        Defendants and Appellants. | G048201<br><br>(Super. Ct. No. DP022908)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant R.F.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant M.R.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Plaintiff and Respondent.

R.F. (Father), and M.R. (Mother), appeal from the order made at the Welfare and Institutions Code section 366.26 hearing (hereafter the .26 hearing)[1] terminating their parental rights to their son, D.F. They contend there is insufficient evidence to support the adoptability finding. We reject their contentions and affirm the order.

FACTS

*Detention*

D.F. was placed in protective custody immediately following his birth on August 12, 2012. Mother had a history of mental illness and both Mother and Father had histories of unresolved substance abuse, domestic violence, anger management problems, and extensive criminal records. Parental rights to another child had already been terminated after they failed to complete their service plan. Father was incarcerated when D.F. was born. Mother used controlled substances during her pregnancy with D.F., and he was born with a positive toxicology screen.

D.F. was born with a condition, called gastroschisis, where his intestines protruded outside his body due to a defect in the umbilical cord. The condition was diagnosed early in Mother's pregnancy, and right after D.F.'s birth, emergency surgery was performed on him. A second surgery was to be performed in a few weeks. D.F. was going to remain hospitalized for about one month. D.F. was otherwise born healthy with an Apgar score of eight or nine. A petition was filed alleging dependency jurisdiction under section 300, subdivision (b) [failure to protect] and subdivision (j) [abuse of sibling].

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

*Jurisdiction/Disposition*

In its September 14, 2012, report for the jurisdictional and dispositional hearing, Orange County Social Services Agency (SSA), recommended D.F. be declared a dependent child and no reunification services be offered to Mother or Father. The social worker reported D.F. remained hospitalized. He had an early medical set-back, but his second surgery was performed as planned on August 20, 2012. He experienced some drug withdrawal symptoms. By September 11, the hospital reported D.F. "ha[d] really turned the corner for the good!" He was keeping his food down, he was almost done taking antibiotics, his sutures were being removed in a day or two, he was being weaned off methadone, and he was being cleared for release from the hospital.

SSA was investigating various relatives for placement, but the maternal uncle who was already adopting D.F.'s older sibling had declined placement because he and his wife were expecting a baby in the next few months. Mother was having visits with D.F.; Father, who was still incarcerated, was not.

D.F. was released from the hospital on September 17, 2012, and placed in a medical foster home. At the jurisdictional hearing on October 9, 2012, the court found the allegations of the petition true and set a disposition hearing.

On November 14, 2012, SSA reported D.F. remained in the same foster home. Mother continued having occasional visits with D.F.; Father remained incarcerated and had no visits. On November 12, the foster mother reported D.F. was "doing great! Eating well . . . . Doing [well] with tummy time and has good control of his head." The foster mother observed D.F. was "stiff" and she would follow up with the hospital on this.

At the disposition hearing on November 19, 2012, the court declared D.F. a dependent child and ordered him removed from parental custody. It denied reunification services for both parents and set a .26 hearing for March 19, 2013.

3

*Permanency Planning*

In its March 8, 2013, report for the .26 hearing, SSA recommended terminating parental rights. D.F. remained in the same medical foster home and was thriving. He was content and described as "a very happy child" who "smile[d] often and is very engaging." The foster parents had no concerns about D.H.'s emotional or mental health, but they were not able to adopt any more children.

SSA reported on D.F.'s medical assessment. Both Mother and Father had reported having the same "life-threatening medical condition" and D.F. "will be tested for this condition between 15-18 months, as is standard procedure." The report described D.F.'s one-month hospitalization from August 12 to September 17, 2012, due to his intestinal birth defect. During that time, D.F. "underwent multiple diagnostic studies, was on a ventilator with oxygen support, received nutrition, fluids and antibiotics intravenously. He was treated for suspected sepsis and had surgery to correct the gastric defect. Often children with gastroschisis require follow up surgery, which is planned for [D.F.] in the future." D.F.'s next medical appointment was set for May 2013, and in the meantime, he "wears an abdominal binder for reduction and support of a remaining abdominal hernia." Since being placed in the medical foster home, D.F. had received consistent medical attention and had graduated to solid foods. He continued to have "a 'stiff lung' due to being on a ventilator at birth."

Developmentally, D.F. was growing as expected, could roll over, "coo" and was responsive to his environment. SSA determined D.F. was "highly adoptable as he possesses many positive qualities," including his age, positive developmental progress, and attractiveness. SSA believed adoption was likely and was the appropriate permanent plan.

At the time the .26 hearing report was filed, SSA had not identified a prospective adoptive family for D.F. The social worker explained that from August 2012 through February 2013, SSA had been assessing various relatives suggested by Mother

4

and Father for placement. Each relative contacted would in turn suggest another possible relative for placement. All the relatives contacted eventually declined to take D.F. for various reasons including lack of current housing, unwillingness to commit to caring for a young child, or fear of harassment by Father. Accordingly, the social worker had reviewed other families with approved adoptive home studies and had selected a prospective adoptive family. The social worker was awaiting supervisor approval and expected to place D.F. with the selected adoptive family by the end of March 2013.

The .26 hearing took place on March 21, 2013. D.F. was placed in the prospective adoptive home that morning. Father's counsel objected to terminating parental rights, primarily asserting D.F. should be placed with relatives. Father's counsel conceded he had no evidence to support application of any of the exceptions to terminating parental rights but suggested that because D.F. had "some fairly extensive medical issues. [¶] Perhaps, it could be argued [he] is not adoptable as a result of that. . . ." Mother's counsel joined in Father's arguments.

County Counsel addressed Father's arguments concerning relative placement, pointing out the only reason D.F.'s placement with a prospective adoptive family had been delayed was the "daisy chain" of relatives SSA was constantly following up on. "[D.F.] would have been placed in a pre-adoptive home previously and almost immediately but for attempting to place with all of these relatives for the past several months." County Counsel argued D.F. was generally adoptable based on the assessments in the .26 hearing report. Minor's counsel agreed with County Counsel.

The juvenile court found D.F. was adoptable pursuant to section 366.26, subdivision (c)(1), none of the exceptions to terminating parental rights applied, terminated parental rights, and set a review hearing for September 17, 2013.

DISCUSSION

Mother and Father challenge the juvenile court's finding D.F. was likely to be adopted. They contend D.F. is a medically fragile infant because he suffered from a

5

congenital birth defect that required multiple surgeries, needs future medical monitoring, and *might* suffer from the same "life-threatening medical condition" with which both parents have been diagnosed. Moreover, although D.F. was placed with a prospective adoptive family on the day of the .26 hearing, the parents argue there was no assessment of that family and their ability to adopt, and there was no evidence they had been apprised of or understood D.F.'s medical needs. We reject the parents' contentions.

"The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1060 (*Carl R.*).) "The question of adoptability posed at a section 366.26 hearing usually focuses on whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt that child." (*Carl R., supra,* 128 Cal.App.4th at p. 1061.) "[I]t is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.'" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) Indeed, under section 366.26, subdivision (c)(1), "[t]he fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."

"Review of a determination of adoptability is limited to whether those findings are supported by substantial evidence." (*Carl R.*, *supra*, 128 Cal.App.4th at p. 1061.) "In reviewing the juvenile court's order, we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400.) "If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we must uphold those findings. We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence." (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.) "On

6

review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The appellant bears the burden of demonstrating "there is no evidence of a sufficiently substantial character to support the verdict." (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

The parents' contention is based on the incorrect assumption D.F. was considered adoptable only because a prospective adoptive family had been identified for placement. There is no evidence the juvenile court's adoptability finding was based on the existence of a specifically identified adoptive parent. In this regard, this case is easily distinguished from *In re Valerie W.* (2008) 162 Cal.App.4th 1, 13-14, and *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205, cases in which the adoptability findings were based on a specific person's willingness to adopt. As already noted, for a child who is generally adoptable, neither a child's placement in a potential adoptive home nor the availability of prospective adoptive parents "'waiting in the wings'" is a prerequisite to finding adoptability. (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1649.) All that is required is clear and convincing evidence of the likelihood the child will be adopted within a reasonable time. (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223-225.) Substantial evidence supports the finding D.F. was generally adoptable. SSA determined D.F. was "highly adoptable" due to his "many positive qualities." He was described as a happy and engaging baby who was fully on target emotionally and developmentally. His medical condition relating to his gastroschisis was being monitored. As for the possibility D.F. may eventually be found to suffer from the same "life threatening medical condition" with which both parents have been diagnosed, without more, it is pure speculation that such a possibility renders D.F. unadoptable.

The parents suggest SSA's inability to place D.F. with relatives indicates his medical condition was so grave that none were willing to care for him, thus

7

undermining the finding of adoptability. The record does not support them. SSA explained the relatives declined placement for their own personal reasons and nothing suggests it was due to D.F.'s medical needs. Efforts at placing D.F. with a relative were on-going up until shortly before the .26 hearing. As County Counsel pointed out, but for the time spent assessing relatives, SSA could have placed D.F in a pre-adoptive home "almost immediately."

Finally, any complaints by the parents concerning a lack of information about the prospective adoptive parents' commitment to adopting or understanding D.F.'s medical needs is rendered moot by subsequent events. SSA has moved to augment the record on appeal with postjudgment evidence including its status review report filed in the juvenile court in anticipation of the court's September 17, 2013, review hearing, and the minute order from that hearing. (Code Civ. Proc., § 909; Cal. Rules of Court, rules 8.155(a), 8.252 & 8.410.) We grant SSA's motion because our consideration of the postjudgment evidence will expedite these proceedings and promote the finality of the judgment. (See *In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1422 [proper to augment record to include agency's addendum report disclosing adoptive home study was approved].)

The report indicates D.F. was placed with the prospective adoptive parents on March 21, 2013, the day of the .26 hearing, and has remained there. The prospective adoptive parents requested de facto parent status and are awaiting finalization of the adoption. The prospective adoptive parents were provided all known information about D.F.'s medical condition and his care needs *prior* to his placement with them. In their care, the child's condition had greatly improved and they have demonstrated an ability to care for him. The prospective adoptive parents attended all D.F.'s medical appointments and followed all medical recommendations. D.F. had surgical repair of his remaining hernia in July 2013. The prospective adoptive parents stayed with him in the hospital and were instrumental during his recovery period. D.F. continues to grow and thrive in the

8

prospective adoptive parents' home, has been weaned off all medicine, does not use any medical equipment, is happy and well tempered, has no active diagnosis and is completely healthy. Significantly, *prior* to accepting placement of D.F., the prospective adoptive parents were informed of the need "when he is 15-18 months of age for [illness removed due to medical confidentiality] testing, a condition which he was exposed to prenatally." (Original brackets.) "[They] have not wavered in their commitment to the child based on the possibility of this condition or any of [his] other needs." The juvenile court granted the prospective adoptive parents de facto parent status and found adoption remained the permanent plan.

In short, substantial evidence supports the juvenile court's finding D.F. was adoptable. Therefore, the order terminating parental rights must be affirmed.

DISPOSITION

The order terminating parental rights is affirmed. SSA's motion of September 26, 2013, to augment the record is granted.

O'LEARY, P. J.

WE CONCUR:

RYLAARSDAM, J.

BEDSWORTH, J.

9